CFJ/xNOD
& no orig-sign
BY: KG

ORIGINAL

FILED
U.S. DISTRICT COURT
NORTHERN DIST. OF TX
FT. WORTH DIVISION

2006 DEC 29  AM 9: 46

CLERK OF COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| ROBERT OUTLAW, On Behalf of Himself and All Others Similarly Situated, :<br><br>Plaintiff, :<br><br>v. :<br><br>RADIOSHACK CORPORATION, FRANK J. BELATTI, RONALD E. ELMQUIST, ROBERT S. FALCONE, DANIEL R. FEEHAN, RICHARD J. HERNANDEZ, H. EUGENE LOCKHART, JACK L. MESSMAN, WILLIAM G. MORTON, JR., THOMAS G. PLASKETT, EDWINA D. WOODBURY, DAVID EDMONDSON, CLAIRE H. BABROWSKI, DAVID G. BARNES, DAVID P. JOHNSON, THE RADIOSHACK ADMINISTRATIVE COMMITTEE, and JOHN DOES 1 THROUGH 30, :<br><br>Defendants. : | 4-06CV-900-A<br>CIVIL ACTION NO. _____ |

## CLASS ACTION COMPLAINT FOR VIOLATIONS OF
## THE EMPLOYEE RETIREMENT INCOME SECURITY ACT

Plaintiff Robert Outlaw("Plaintiff"), on behalf of himself and the Radioshack 401(k) Plan

("401(k) Plan") and the RadioShack Supplemental Stock Purchase Plan ("Supplemental Plan")

(collectively, the "Plan"), and a class of similarly situated participants and beneficiaries (the

"Participants") of the Plan, by his attorneys, alleges the following for his Complaint (the

"Complaint"):

## NATURE OF THE ACTION AND SUMMARY OF CLAIMS

1.     Plaintiff, a participant in the Plan, brings this action against RadioShack Corporation

("RadioShack" or the "Company") and others for Plan-wide relief on behalf of the Plan, and on

behalf of a class of Participants in the Plan for whose individual accounts the Plan held an interest in the common stock of RadioShack from May 11, 2005, to the present (the "Class Period"). Plaintiff brings this action on behalf of the Plan and the Participants pursuant to § 502(a)(2) and (3) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(2)and (3).

2.      As more fully set forth below, Defendants breached their fiduciary duties owed to the Plan and the Participants, including those fiduciary duties set forth in ERISA § 404, 29 U.S.C. § 1104, and Department of Labor Regulations, 29 C.F.R. § 2550. As a result of these wrongful acts, pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a), Defendants are liable to make good to the Plan the losses resulting from each such breach of fiduciary duty. Plaintiff also seeks equitable relief.

3.      Plaintiff alleges that it was imprudent for the Plan to invest in RadioShack common stock because the common stock was too risky for a retirement plan investment in that the price of common stock was artificially inflated. Plaintiff also alleges that Defendants breached their fiduciary duties by negligently failing to disclose material information necessary for Participants to make informed decisions concerning the Plan's assets and benefits and investing in RadioShack common stock.

## JURISDICTION AND VENUE

4.      Plaintiff's claims arise under ERISA Section 502(e)(1), 29 U.S.C. § 1132(e)(1).

5.      This Court has jurisdiction over this action pursuant to ERISA Section 502(e)(l), 29 U.S.C. § 1132(e)(l).

6.      Venue is proper in this district pursuant to ERISA Section 502(e)(2), 29 U.S.C. § 1132(e)(2), because this is the district where some or all of the breaches took place, where one or more Defendants reside or may be found, and/or where the acts and transactions alleged herein, including the administration of the Plan, occurred.

## THE PARTIES

**Plaintiff**

7.      Plaintiff Robert Outlaw is a resident of the State of California, County of Orange. At various times, Plaintiff's individual account in the Plan included RadioShack common stock as an investment option under the Plan.

**Defendants**

8.      Defendant RadioShack engages in the retail sale of consumer electronics goods and services through the Company's store chain and non-RadioShack branded kiosk operations.

9.      Defendant Frank J. Belatti ("Belatti") has served as a Director of the Company since 1998.  Defendant Belatti is also a member of the Audit and Compliance Committee and the Management Development and Compensation Committee.  Because of Defendant Belatti's position, he knew the adverse non-public information about the business of RadioShack, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Class Period, Defendant Belatti participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Upon information and belief, Defendant Belatti was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) the management and administration of the Plan; and/or (ii) the management and disposition of the Plan's assets.

10.      Defendant Ronald E. Elmquist ("Elmquist") has served as a Director of the Company since 1997.  Defendant Elmquist is a member of the Audit and Compliance Committee and the

Corporate Governance Committee. Because of Defendant Elmquist's position, he knew the adverse non-public information about the business of RadioShack, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Class Period, Defendant Elmquist participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Upon information and belief, Defendant Elmquist was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) the management and administration of the Plan; and/or (ii) the management and disposition of the Plan's assets.

11.     Defendant Robert S. Falcone ("Falcone") has served as a Director of the Company since 2003. Defendant Falcone is the chair of the Audit and Compliance Committee and a member of the Executive Committee. Because of Defendant Falcone's position, he knew the adverse non-public information about the business of RadioShack, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Class Period, Defendant Falcone participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Upon information and belief, Defendant Falcone was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) the management and administration of the Plan; and/or (ii) the management and disposition of the Plan's assets.

12.     Defendant Daniel R. Feehan ("Feehan") has served as a Director of the Company since 2003. Defendant Feehan is the Chair of the Finance and Strategic Transactions Committee and a member of the Executive Committee and the Management Development and Compensation Committee. Because of Defendant Freehan's position, he knew the adverse non-public information about the business of RadioShack, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Class Period, Defendant Freehan participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Upon information and belief, Defendant Freehan was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) the management and administration of the Plan; and/or (ii) the management and disposition of the Plan's assets.

13.     Defendant Richard J. Hernandez ("Hernandez") served as a Director of the Company since 2001. Defendant Hernandez is a member of the Audit and Compliance Committee. Because of Defendant Hernandez's positions, he knew the adverse non-public information about the business of RadioShack, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Class Period, Defendant Hernandez participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Upon information and belief, Defendant Hernandez was a fiduciary of the Plan within the meaning of ERISA in that he

exercised discretionary authority with respect to: (i) the management and administration of the Plan; and/or (ii) the management and disposition of the Plan's assets.

14.     Defendant H. Eugene Lockhart ("Lockhart") has served as a Director of the Company since 2003. Defendant Lockhart is a member of the Audit and Compliance Committee. Because of Defendant Lockhart's Board position, he knew the adverse non-public information about the business of RadioShack, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Class Period, Defendant Lockhart participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Upon information and belief, Defendant Lockhart was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) the management and administration of the Plan; and/or (ii) the management and disposition of the Plan's assets.

15.     Defendant Jack L. Messman ("Messman") has served as a Director of the Company since 1993. Defendant Messman is a member of the Finance and Strategic Transactions Committee and the Management Development and Compensation Committee. Because of Defendant Messman's Board position, he knew the adverse non-public information about the business of RadioShack, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Class Period, Defendant Messman participated in the issuance of false and/or misleading statements, including the preparation of the

false and/or misleading press releases and SEC filings. Upon information and belief, Defendant Messman was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) the management and administration of the Plan; and/or (ii) the management and disposition of the Plan's assets.

16.    Defendant William G. Morton, Jr. ("Morton") has served as a Director of the Company since 1987. Defendant Morton is a member of the Corporate Governance Committee. Because of Defendant Morton's Board position, he knew the adverse non-public information about the business of RadioShack, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Class Period, Defendant Morton participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings. Upon information and belief, Defendant Morton was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) the management and administration of the Plan; and/or (ii) the management and disposition of the Plan's assets.

17.    Defendant Thomas G. Plaskett ("Plaskett") has served as a Director of the Company since 1986. Defendant Plaskett is the Chair of the Corporate Governance Committee and a member of the Executive Committee and the Finance and Strategic Transactions Committee. He has also been designated the presiding Director of the Board. Because of Defendant Plaskett's Board position, he knew the adverse non-public information about the business of RadioShack, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance

at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Class Period, Defendant Plaskett participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Upon information and belief, Defendant Plaskett was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) the management and administration of the Plan; and/or (ii) the management and disposition of the Plan's assets.

18.     Defendant Edwina D. Woodbury ("Woodbury") has served as a Director of the Company since 1998.  Defendant Woodbury is currently a member of the Audit and Compliance Committee and the Finance and Strategic Transactions Committee.   Because of Defendant Woodbury's Board position, she knew the adverse non-public information about the business of RadioShack, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to her in connection therewith. During the Class Period, Defendant Woodbury participated in the issuance of false and/or misleading statements, including the preparation of the false and/or misleading press releases and SEC filings.  Upon information and belief, Defendant Woodbury was a fiduciary of the Plan within the meaning of ERISA in that she exercised discretionary authority with respect to: (i) the management and administration of the Plan; and/or (ii) the management and disposition of the Plan's assets.

19.     Defendant David Edmondson ("Edmondson") was President and Chief Executive Officer of the Company up until February 20, 2006.  Upon information and belief, Defendant Edmonson was a fiduciary of the Plan within the meaning of ERISA in that he exercised

discretionary authority with respect to: (i) the management and administration of the Plan; and/or (ii) the management and disposition of the Plan's assets.

20.     Defendant Claire H. Babrowski ("Barbrowski") is President and Chief Operating Officer of the Company (effective July 5, 2005) and Acting Chief Executive Officer of the Company (effective February 20, 2006).  Upon information and belief, Defendant Barbrowski was a fiduciary of the Plan within the meaning of ERISA in that she exercised discretionary authority with respect to: (i) the management and administration of the Plan; and/or (ii) the management and disposition of the Plan's assets.

21.     Defendant David G. Barnes ("Barnes") is Senior Vice President and Chief Financial Officer of the Company (as of April 18, 2005).  Upon information and belief, Defendant Barnes was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) the management and administration of the Plan; and/or (ii) the management and disposition of the Plan's assets.

22.     Defendant David P. Johnson ("Johnson") is Senior Vice President and Chief Accounting Officer of the Company. Upon information and belief, Defendant Johnson was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) the management and administration of the Plan; and/or (ii) the management and disposition of the Plan's assets.

23.     Defendant the RadioShack Administrative Committee ("Plan Board") is comprised of RadioShack officers, directors and employees who participated in administering the Plan.

24.     The RadioShack Board of Directors had the fiduciary responsibility for decisions regarding the acquisition, holding, disposition and voting of Employer Stock in the Plan and had the

exclusive power, authority and responsibility to determine whether to sell, purchase or hold RadioShack stock.

25.    Plaintiff is unaware of the true names and capacities of the remaining Defendants sued in this action by the fictitious names JOHN DOES 1 through 30. At least some of those individuals are members of RadioShack's Plan Board, but Plaintiff has not yet been able to identify them. Plaintiff will amend this Complaint when Plaintiff learns the names and capacities of those Defendants. Plaintiff is informed and believes that each of the fictitiously named Defendants is in some manner responsible for the events that have damaged Plaintiff, the Plan and the Class.

## CLASS ACTION ALLEGATIONS

26.    Plaintiff brings this action on his own behalf and, pursuant to Rules 23(a),(b)(l), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of a class of all current and former participants in the Plan at any time from May 11, 2005, to the present. Excluded from the Class are Defendants herein, officers and directors of Defendant RadioShack, members of the Individual Defendants' immediate families, and the heirs, successors or assigns of any of the foregoing.

27.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there were hundreds, if not thousands, of present and former employees of RadioShack who held shares of RadioShack common stock in their individual accounts under the Plan.

28.    Common questions of law and fact exist as to all members of the Class which predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

        (a)    Whether Defendants were fiduciaries;

(b)     Whether Defendants breached their fiduciary duties;

(c)     Whether the Plan and the Participants were injured by such breaches; and

(d)     Whether the Class is entitled to certain benefits and injunctive relief.

29.     Plaintiff's claims are typical of the claims of the other members of the Class as Plaintiff and all members of the Class sustained injury arising out of Defendants' wrongful conduct in breaching their fiduciary duties and violating ERISA as complained of herein.

30.     Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has retained able counsel with experience in ERISA class action litigation. The interests of Plaintiff are coincident with and not antagonistic to the interests of the other Class members.

31.     Prosecution of separate actions by members of the Class would create a risk of inconsistent adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants. In addition, adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

32.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the injury suffered by the individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## DESCRIPTION OF THE PLAN

33.     The RadioShack Corporation Savings and Investment Plan is an employee benefit plan within the meaning of ERISA §§ 3(3) and 3(2)(A), 29 U.S.C. §§ 1002(3) and 1002(2)(A).

34.     The Plan was established by RadioShack explicitly to provide retirement benefits to its employees.

35.     The Form 11-K Annual Report filed with the Securities and Exchange Commission ("SEC") by the 401(k) Plan on or about June 28, 2005, covering the 401(k) Plan's fiscal year ended December 31, 2004, states, among other things:

> **Description of the Plan**
>
> The following description of the RadioShack 401(k) Plan (the "Plan") provides only general information. Participants should refer to the Summary Plan Description, which also constitutes the Plan's prospectus, for a more complete description of the Plan's provisions.
>
> **General**
>
> The Plan is a defined contribution employee benefit plan covering eligible employees of RadioShack Corporation, its divisions and subsidiaries (the "Company" or "RadioShack"). The Plan is an individual account plan with multiple, participant-directed investment options and is intended to conform to and qualify under Section 401 of the Internal Revenue Code (the "Code"), as amended. The Plan is subject to the provisions of the Employee Retirement Income Security Act of 1974, as amended ("ERISA").
>
> At December 31, 2004 and 2003, there were 8,011 and 9,814 employees of the Company participating in the plan and 22,304 and 20,113 employees eligible to participate, respectively.
>
> The Plan is fully participant-directed and consists of RadioShack common stock, registered investment companies, common/collective trusts and money market funds.
>
> **Administration**
>
> The Company's Board of Directors has appointed Putnam Fiduciary Trust Company ("Putnam") as the Plan's trustee and record keeper.

The Plan is administered by an Administrative Committee appointed by the Board of Directors of the Company.

## Eligibility

An employee is eligible to participate in the Plan at the beginning of the calendar quarter in which they are expected to complete one year of service of at least 1,000 hours, as defined in the Summary Plan Description, and attain the age of 18. Temporary employees are excluded from participation in the Plan.

## Participant Contributions

Through authorized payroll deductions, participants may contribute to the Plan, on a pre-tax basis, up to 8%, in increments of 1%, of their annual compensation. During the 2004 plan year, in accordance with the provisions of the Code, no participant could elect more than $16,000 in pre-tax contributions, which includes a $3,000 limit for catch-up contributions.

Participants may direct their contributions into various investment options. Participants may elect to allocate their total contributions to the various investment options in increments of 1%.

Participants are not subject to federal income taxation on their contributions and earning thereon until withdrawn from the Plan.

## Company Contributions

All Company contributions are discretionary and are made in the form of RadioShack common stock equal to 30% of a participant's contribution.

## Participants' Accounts

Each participant's account is credited with the participant's contribution and allocations of (a) the Company's discretionary matching contribution, and (b) plan earnings. Allocations are based on the participant's contribution or number of shares held, as defined. The benefit to which a participant is entitled is the benefit that can be provided from the participant's vested account.

The common stock account represents the participants' interest in RadioShack common stock that has been allocated on a pro rata basis to the participants' individual accounts.

36.     The Form 11-K Annual Report filed with the SEC by the Supplemental Plan on or about June 28, 2005, covering the Supplemental Plan's fiscal year ended December 31, 2004, states, among other things:

### Description of the Plan

The following description of the RadioShack Supplemental Stock Purchase Plan (the "Plan") provides only general information. Participants should refer to the Plan's prospectus for a more complete description of the Plan's provisions.

### General

The purpose of the Plan is to assist the employees of RadioShack Corporation, its divisions and subsidiaries (collectively, the "Company") in building personal net worth and to encourage ownership in the Company by providing an opportunity for regular investment in the Company's common stock after an employee has reached his or her maximum annual salary deferral contribution limit under the RadioShack 401(k) Plan, as set forth by the Internal Revenue Code (the "Code").

The Plan has one investment option, the Company's common stock, rendering the entire Plan nonparticipant-directed. Information about the net assets and the significant components of the changes in net assets relating to the nonparticipant-directed investment is presented in the accompanying statements of net assets available for benefits and the statement of changes in net assets available for benefits.

*The Plan is subject to Title I of the Employee Retirement Security Act of 1974 ("ERISA") relating to the protection of employee benefit rights*, but is not subject to Title IV, relating to plan termination insurance coverage and such insurance is not extended to participants in the Plan.

### Administration

The Plan is administered by an Administrative Committee appointed by the Board of Directors of the Company. The assets of the Plan are monitored and transactions therein are maintained by the Plan's sponsor, RadioShack Corporation.

**Contributions**

Through authorized payroll deductions, a participant may contribute, on a pre-tax basis, up to 8% of his or her gross salary or wages to the Plan after reaching a maximum annual salary deferral contribution limit under the RadioShack 401(k) Plan.

The Company makes matching contributions to the Plan equal to 80% of a participant's contribution.

Cash dividends are credited to a participant's account as other contributions paid on the shares of common stock in the participant's account and are reinvested to purchase additional shares of the Company's common stock. These other contributions are not subject to matching contributions by the Company.

A participant's contributions and the Company's matching contribution are components of the participant's current compensation and, as such, are subject to all applicable federal insurance contributions and federal, state, and local withholding taxes. The cash dividends allocated to a participant's account are taxable to the participant in the calendar year allocated.

At the end of each calendar quarter or as promptly as practicable thereafter, the participant's contribution, the Company contribution and any other contributions are aggregated for the purpose of acquiring Company's common stock, with shares being credited to each participant's account on the basis of the number of shares purchased at a price equal to the average of the closing prices of the Company's common stock as reported in the New York Exchange Composite Transactions for each trading day in the calendar month in which the contributions are made.

**Participant Accounts**

Each participant's account is credited with the participant's contribution, the appropriate Company matching contribution and associated dividends on the underlying shares.

(Emphasis added).

## ADMINISTRATION OF THE PLAN

37.    At all times relevant to this Complaint, all Defendants were fiduciaries of the Plan as defined by ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because they exercised

discretionary authority or control respecting management, disposition of assets and had discretionary

authority or responsibility in the administration of the Plan.

38.    RadioShack is the Plan Administrator.

39.    Each Defendant is liable for the breaches of fiduciary duty of the other Defendants

under ERISA Section 405, 29 U.S.C. § 1105.

### FIDUCIARY DUTIES UNDER ERISA

40.    **The Statutory Requirements:** ERISA imposes strict fiduciary duties upon plan

fiduciaries.  ERISA § 404(a), 29 U.S.C. § 1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely
> in the interest of the participants and beneficiaries and . . . for the
> exclusive purpose of providing benefit to participants and their
> beneficiaries; and defraying reasonable expenses of administering the
> plan; with the care, skill, prudence, and diligence under the
> circumstances then prevailing that a prudent man acting in a like
> capacity and familiar with such matters would use in the conduct of
> an enterprise of like character and with like aims; by diversifying the
> investments of the plan so as to minimize the risk of large losses,
> unless under the circumstances it is clearly prudent not to do so; and
> in accordance with the documents and instruments governing the plan
> insofar as such documents and instruments are consistent with the
> provisions of this title and Title IV.

41.    **The Duty of Loyalty:** ERISA imposes on a plan fiduciary the duty of loyalty – that

is, the duty to "discharge his [or her] duties with respect to a plan solely in the interest of the

participants and beneficiaries and . . . for the exclusive purpose of . . .  providing benefits to

participants and their beneficiaries . . . ."

42.    The duty of loyalty entails a duty to avoid conflicts of interest and to resolve them

promptly when they occur.  A fiduciary must always administer a plan with an "eye single" to the

interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves

or the plan sponsor.

43.     **The Duty of Prudence:** Section 404(a)(1)(B) also imposes on a plan fiduciary the duty of prudence – that is, the duty "to discharge his [or her] duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. . . ."

44.     **The Duty to Inform:** The duties of loyalty and prudence include the duty to disclose and inform. These duties entail: (i) a duty not to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries. These duties to disclose and inform recognize the disparity that may exist, and in this case did exist, between the training and knowledge of the fiduciaries, on the one hand, and the Participants, on the other.

45.     Pursuant to the duty to inform, fiduciaries of the Plan were required under ERISA to furnish certain information to Participants. For example, ERISA § 101, 29 U.S.C. § 1021, requires that fiduciaries furnish a summary plan description ("SPD") to Participants. ERISA § 102, 29 U.S.C. § 1022, provides that the SPD must apprise Participants of their rights under the plan. The SPD and all information contained or incorporated therein constitutes a representation in a fiduciary capacity upon which Participants were entitled to rely in determining the identity and responsibilities of fiduciaries under the Plan and in making decisions concerning their benefits and investment and management of assets allocated to their accounts:

> The format of the summary plan description must not have the effect of misleading, misinforming or failing to inform participants and beneficiaries. Any description of exceptions, limitations, reductions, and other restrictions of plan benefits shall not be minimized,

rendered obscure or otherwise made to appear unimportant. Such exceptions, limitations, reductions, or restrictions of plan benefits shall be described or summarized in a manner not less prominent than the style, captions, printing type, and prominence used to describe or summarize plan benefits. The advantages and disadvantages of the plan shall be presented without either exaggerating the benefits or minimizing the limitations. The description or summary of restrictive plan provisions need not be disclosed in the summary plan description in close conjunction with the description or summary of benefits, provided that adjacent to the benefit description the page on which the restrictions are described is noted.

29 C.F.R. § 2520.102-2(b).

46.    **The Duty to Investigate and Monitor Investment Alternatives:**  With respect to a retirement plan such as the Plan, the duties of loyalty and prudence also entail a duty to conduct an independent investigation into, and continually to monitor, the merits of the investment alternatives in the Plan, including employer securities, to ensure that each investment is a suitable option for the Plan.

47.    **The Duty to Monitor Appointed Fiduciaries.**   Fiduciaries who have the responsibility for appointing other fiduciaries have the further duty to monitor the fiduciaries thus appointed.  The duty to monitor entails both giving information to and reviewing the actions of the appointed fiduciaries.  In a retirement plan such as the Plan, the monitoring fiduciaries must therefore ensure that the appointed fiduciaries:

(a)    possess the needed credentials and experience, or use qualified advisors and service providers to fulfill their duties;

(b)    are knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of the Plan's participants;

(c)    are provided with adequate financial resources to do their jobs;

(d)     have adequate information to do their jobs of

overseeing the Plan investments with respect to all investment options, including company stock;

(e)     have access to outside, impartial advisors when

needed;

(f)     maintain adequate records of the information on

which they base their decisions and analysis with respect to Plan investment options; and

(g)     report regularly to the monitoring fiduciaries.

The monitoring fiduciaries must then review, understand, and approve the conduct of the hands-on

fiduciaries.

48.     **The Duty Sometimes to Disregard Plan Documents**.  A fiduciary may not avoid

his fiduciary responsibilities by relying solely on the language of the plan documents.  While the

basic structure of a plan may be specified, within limits, by the plan sponsor, the fiduciary may not

blindly follow the plan document if to do so leads to an imprudent result.  ERISA § 404(a)(1)(D),

29 U.S.C. § 1104(a)(1)(D).

49.     **Co-Fiduciary Liability**.  A fiduciary is liable not only for fiduciary breaches within

the sphere of his own responsibility, but also as a co-fiduciary in certain circumstances.  ERISA

§ 405(a), 29 U.S.C. § 1105(a), states, in relevant part, that:

> In addition to any liability which he may have under any other
> provision of this part, a fiduciary with respect to a plan shall be liable
> for a breach of fiduciary responsibility of another fiduciary with
> respect to the same plan in the following circumstances:
>
> (1)     if he participates knowingly in, or knowingly undertakes to
> conceal, an act or omission of such other fiduciary, knowing
> such act or omission is a breach; or
>
> (2)     if, by his failure to comply with section 404(a)(1) in the
> administration of his specific responsibilities which give rise

> to his status as a fiduciary, he has enabled such other fiduciary
> to commit a breach; or
>
> (3)   if he has knowledge of a breach by such other fiduciary,
> unless he makes reasonable efforts under the circumstances to
> remedy the breach.

50.   **Non-Fiduciary Liability**. Under ERISA, non-fiduciaries who knowingly participate in a fiduciary breach may themselves be liable for a breach of fiduciary duty under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

## PARTICIPANTS ARE NOT RESPONSIBLE FOR
## IMPRUDENT PLAN INVESTMENTS

51.   The fact that Participants selected investments from options pre-selected by Defendants is no defense in this case. Fiduciaries can shift liability for imprudent investments to Participants under ERISA § 404(c), 29 U.S.C. § 1104(c) only if, among other things, they meet five specific requirements:

> (a)   they disclose in advance the intent to shift liability to Participants;
>
> (b)   they designate the Plan as a "404(c) Plan" and adequately communicate this to Participants;
>
> (c)   they ensure that Participants are not subject to undue influence;
>
> (d)   they provide an adequate description of the investment objectives and risk and return characteristics of each investment option; and
>
> (e)   they disclose to Participants all material information necessary for Participants to make investment decisions that they are not precluded from disclosing under other applicable law. In this regard, fiduciaries have a choice, they can disclose all material information to Participants, including information that they are not required to disclose under the securities laws, and shift liability to Participants, or they can comply with the more limited disclosure requirement under the securities laws but remain liable for imprudent investments.

29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(i) and (ii) and (c)(2)(i) and (ii).

52.     Defendants failed to shift liability to Participants for imprudent investment decisions under section 404(c) because they failed to comply with the relevant regulations, therefore this defense is not available to Defendants.

## BACKGROUND

53.     Beginning May 11, 2005, Defendants issued a series of false statements concerning RadioShack's culture of integrity, controls, and inventory.  As of May 11, 2005, Defendants also caused false and misleading financial statements to be disseminated to Plan Participants.  The falsities were revealed when, after months of repeated reassurances that the Company's inventory was salable and that markdowns were not required, the Company announced a $62 million write-down of inventory, which it described as a combination of "toys from last year", "obsolete" inventory, and items that were "not selling in any significant quantity."  Upon the release of this news, *the price of the Company's stock dropped 8.04%, with an inordinate volume of 10,487,600 shares traded*.  The price of the Company's stock has never recovered.

## IMPROPER STATEMENTS

54.     On May 11, 2005, RadioShack participated in the Lehman Brothers Eighth Annual Retail Seminar.  During this seminar, Defendant Barnes, who assumed the position of RadioShack's Senior Vice President and Chief Financial Officer effective April 18, 2005, made the following representations:

> *RadioShack is blessed with the culture of integrity and a solid finance team* which is scaled in the sometimes unglamorous but always important work of ensuring that our reported numbers are accurate and that controls meet the high standards of current regulations. You have my commitment that I will work to sustain and enhance those bedrock skills.
>
> Another critical area of focus for me and my team is the quality of our communications with investors. I share with our CEO-elect, Dave Edmondson, the determination to ensure that our disclosure to the

investment community is clear, consistent and complete. *I feel strongly that my job is not to be a salesperson for the Company's stock, but rather to provide a candid assessment of our business performance, both the good news and the bad news.* Dave and I will be especially careful about the earnings guidance that we give, ensuring that it reflects a reasonable and achievable outlook for our business.

\* \* \*

*As shown on this slide, we're also improving our assortment of rationalizing SKUs. We continue to work areas of the store with slow-moving product in favor of faster-moving product to drive more gross profit dollars.* In 2004, we rationalized categories and products such as audio-video, cassette recorders, portable CD players, clocks and radios. This year, we have our sights set on other products, including those listed here. *We've identified the bottom quintile of gross profit dollar generating SKUs and are using various techniques to rationalize them.* Depending on the product, we intend to reduce the breadth and increase the depth. We also may perhaps reduce the number of stores that a product is carried in. We may sell something via the Web only, or we made totally eliminate the SKU from the lineup.

(Emphasis added).

55.    In addition, during the May 11, 2005 Lehman Brothers Eighth Annual Retail Seminar,

Defendant Johnson responded to a question regarding inventory as follows:

**UNIDENTIFIED AUDIENCE MEMBER**: Question on the most recent financial (technical difficulty) I think I recall that inventories were up quite a bit in the most recent quarter. And one of the comments that you made about the wireless was that the inventories in wireless were in good shape. So I guess the question is -- why were the inventories up so much and if wireless is in good shape, does that suggest some of the other categories may not be in good shape?

**DAVID JOHNSON**: When we came out of, when we did our investor conference in February, we talked about the inventory that came out of Christmas was about $240 million higher than the prior year. About 40 that we attributed to our kiosks and about 100 million to get our inventory right-sized (indiscernible) out of the fourth quarter of 2003 with simply too little inventory and actually cost of sales in the first quarter of '04. And so then that leaves about 100

million of excess. And about half of that, we worked off in the first quarter and our gross margin rate was only denigrated by about 18 basis points you saw on the slide. So we still have about half that inventory to work through. We've seen some categories where we don't expect excessive markdowns. The wireless inventory, we did come out of Q4 a little bit heavy in the wireless area but that has been corrected by the end of the first quarter. So in summary, basically *we've worked off half the overage in the first quarter*. Only 19 and 18 basis points of margin denigration and *we don't expect any huge writedowns or markdowns to get rid of the remainder of that inventory*. It's in some categories that simply don't require us to move through it, we just slow up purchases.

(Emphasis added).

56.     Defendants breached their fiduciary duty by falsely stating that RadioShack:

    a.     was blessed with the culture of integrity.

    b.     reported accurate numbers.

    c.     controls met high standards.

    d.     was improving its rationalizing of SKUs.

    e.     had identified the bottom quintile of gross profit dollar generating SKUs and were employing various techniques to rationalize them.

57.     Defendants breached their fiduciary duty by falsely stating that the Company did not expect any huge writedowns or markdowns in connection with the disposition of the Company's excess, obsolete, and slow moving inventory.

58.     On July 19, 2005, RadioShack issued a press release announcing 2005 second quarter financial results. In this press release, the Company reported net income of $52.3 million or $0.33 per diluted share for the quarter ended June 30, 2005 versus net income of $68.3 million or $0.42 per diluted share for the quarter ended June 30, 2004. Commenting on these reported results, Defendant Edmondson stated: "Our profit decline in the second quarter was driven by lower comp store sales and more specifically by weakness in our core store wireless business. *Nevertheless,*

*non-wireless product lines . . . are performing well and this gives us confidence in the future.*"

(Emphasis added).

59.     Defendants breached their fiduciary duty by falsely stating that non-wireless product lines were "performing well" when this was untrue and there was a massive inventory buildup of excess, obsolete, and slow moving products.

60.     On July 19, 2005, the Company also held a conference call.   During this call, Defendant Edmondson responded to a question regarding the salability of the Company's inventory and the need for markdowns as follows:

> **MARK ROWEN, ANALYST, PRUDENTIAL EQUITY GROUP**:
> A couple of questions -- Dave, first on the inventory, you talked about a portion of that being or half of that being due to low sales. Are you going to have to mark that merchandise down this quarter, and is that going to hurt margins this quarter?  Then, could you also elaborate a little bit on the change in the Sprint agreement that caused you inventory to go up?  You said that was better economics, but it was also going to hurt your cash flow. I didn't quite understand why it's better economics.
>
> **DAVE EDMONDSON**: Okay, yes, let me start with the inventory. Half of the inventory growth from last year is coming through the growth of the kiosks; the other half is coming as a result of lower sales.  As you know, we have a rather long supply chain as it relates to a lot of high-margin products, so getting the forecasting right -- if you don't get it right, obviously you can build up some inventories fairly fast.
>
> *The good news is I think that that inventory is good inventory and it's not necessary for us to go into some kind of a big markdown program to get rid of it.*  You also note that, sequentially, from the end of the fourth quarter of last year, *the overall inventory, while not where we'd like it to be, has improved and so we are selling through it without a lot of pressure on margins.*

(Emphasis added).

61.     Defendants breached their fiduciary duty by issuing the foregoing statements either knowing or negligently failing to know that there was a buildup of excess, obsolete, and slow

moving inventory and that, consequently, massive charges to earnings to write down this inventory were imminent, and by misleadingly stating that the Company's inventory had improved, that it was selling through without a lot of pressure on margins, and that it was not necessary for RadioShack "to go into some kind of a big markdown program to get rid of it." Indeed, approximately two months after the foregoing statements were issued by Defendants, the Company began "aggressively marking down end-of-life inventory" in what it later described as "a significant clearance event."

62.     On August 8, 2005, the Company filed its Form 10-Q for the quarterly period ended June 30, 2005 (the "June 30, 2005 Form 10-Q"). This document, which was signed by Defendants Johnson and Barnes, reported net income of $52.3 million for the quarterly period ended June 30, 2005 and inventory of $971.6 million as of this date.

63.     On June 28, 2005, RadioShack filed with the SEC its Form 11-Ks for the Supplemental Plan and 401(k) Plan. The Form 11-Ks was signed by A. Grothues and R. Ray – Administrative Committee members. The Form 11-Ks contained descriptions of the Supplemental and 401(k) Plans' operations. As such, the Form 11-Ks were Fiduciary Communication. The Form 11-Ks were regularly updated by incorporating by reference, *inter alia*, the periodic financial results of RadioShack and the Supplemental and 401(k) plans contained in the Company's SEC filings, which Participants were able to, and were encouraged to, examine in determining investment options such as RadioShack stock. These representations also constituted Fiduciary Communications.

64.     The June 30, 2005 Form 10-Q incorporated the Company's 2004 Form 10-K by reference ("If you desire further information, you should refer to our consolidated financial statements and management's discussion and analysis of financial condition and results of operations included in our Annual Report on Form 10-K for the year ended December 31, 2004."), which disclosed the Company's method of valuing the Company's inventory:

Inventory Valuation: Our inventory consists primarily of finished goods available for sale at our retail locations or within our distribution centers and is recorded at the lower of average cost or expected sales price (i.e., market value). The cost components recorded within inventory are the vendor invoice cost and certain allocated external and internal freight, distribution, warehousing and other costs required to transport the merchandise from the vendor to the point-of-sale, usually a store.

Typically, the market value of our inventory is higher than its cost. Determination of the market value may be very complex and, therefore, requires a high degree of judgment. In order for management to make the appropriate determination of market value, the following items are commonly considered: inventory turnover statistics, current selling prices, seasonality factors, consumer trends, competitive pricing, performance of similar products or accessories, planned promotional incentives, and estimated costs to sell or dispose of merchandise such as sales commissions.

If the calculated market value is determined to be less than the recorded average cost, a provision is made to reduce the carrying amount of the inventory item. Differences between management estimates and actual performance and pricing of our merchandise could result in inventory valuations that differ from the amount recorded at the financial statement date, and could also cause fluctuations in the amount of recorded cost of products sold.

If our estimates regarding market value are inaccurate or changes in consumer demand affect certain products in an unforeseen manner, we may be exposed to material losses or gains in excess of our established valuation reserve.

65.     The 2004 Form 10-K which was incorporated by reference into the June 30, 2005

Form 10-Q also touted the Company's sophisticated inventory management system stating:

RadioShack Technology Services ("RSTS") – Our management information system architecture is composed of a distributed, online network of computers that links all stores, customer channels, delivery locations, service centers, credit providers, distribution facilities and our home office into a fully integrated system. Each store has its own server to support the point-of-sale ("POS") system. The majority of our company stores communicate through a broadband network, which provides efficient access to customer support data. This design also allows store management to track sales and/or inventory at the product, customer or sales associate level.

RSTS provides the majority of our programming and systems analysis needs.

66. Defendants Johnson and Barnes breached their fiduciary duty by signing the June 30, 2005 Form 10-Q when they knew or negligently failed to know that it:

a. reported inventory and net income ($971.6 million and $52.3 million, respectively) which was materially overstated due to the Company's failure to follow its own stated inventory valuation procedures and establish an appropriate inventory valuation reserve.

b. led Plan Participants to believe that RadioShack's fully integrated management information system (which enabled the Company's home office management to track sales and/or inventory at the product level) was being used to fairly value inventory, when this was untrue.

67. The June 30, 2005 Form 10-Q contained Rule 13a-14(a) certification signed by Defendants Edmondson and Barnes which stated:

1. I have reviewed this quarterly report on Form 10-Q of RadioShack Corporation;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)    Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b)    Any fraud, whether or not material, that involves management or other employees who have a

significant role in the registrant's internal control over
financial reporting.

68.     Defendants Edmondson and Barnes breached their fiduciary duty by signing the

foregoing certifications either knowing or negligently failing to know that the June 30, 2005 Form

10-Q:

a.      contained untrue statements of a material fact (*i.e.*, that inventory and net

income were properly stated).

b.      omitted to state a material fact necessary to make the statements made, in light

of the circumstances under which such statements were made, not misleading with respect to the

period covered by this report (*i.e.*, that and appropriate inventory valuation reserve had not been

established to properly reflect the magnitude of the Company's excess, obsolete, and slow moving

inventory).

c.      contained financial statements, and other financial information that, for the

reasons specified above, did not fairly present in all material respects the financial condition and

results of operations of the Company as of, and for, the quarterly period ended June 30, 2005.

69.     On October 21, 2005, RadioShack issued a press release announcing 2005 third

quarter financial results.  In this press release, the Company reported net income of $108.5 million

or $0.75 per diluted share for the quarter ended September 30, 2005 versus net income of $69.7

million or $0.43 per diluted share for the quarter ended September 30, 2004.

70.     Defendants breached their fiduciary duty by permitting issuance of the October 21,

2005 press release when they knew or negligently failed to know that the press release reported a net

income figure (of $108.5 million) which was materially overstated due to the Company's failure to

follow its own stated inventory valuation procedures and establish an appropriate inventory valuation

reserve.

71.     On November 4, 2005, the Company filed its Form 10-Q for the quarterly period ended September 30, 2005 (the "September 30, 2005 Form 10-Q"). This document, which was signed by Defendants Johnson and Barnes, reported net income of $108.5 million for the quarterly period ended September 30, 2005 and inventory of $1,162.5 million as of this date. It also contained a representation which stated: "We improved the quality of our inventory by aggressively marking down end-of-life inventory in a significant clearance event that began in September 2005."

72.     The September 30, 2005 Form 10-Q incorporated the Company's 2004 Form 10-K by reference ("If you desire further information, you should refer to our consolidated financial statements and management's discussion and analysis of financial condition and results of operations included in our Annual Report on Form 10-K for the year ended December 31, 2004"), which disclosed the Company's method of valuing the Company's inventory and which touted the Company's sophisticated inventory management system as described in paragraphs 64 and 65 above. In addition, it contained Rule 13a-14(a) certification signed by Defendants Edmondson and Barnes which were substantially identical to those discussed in paragraph 67 above.

73.     Defendants Johnson and Barnes breached their fiduciary duty by signing the September 30, 2005 Form 10-Q when they knew or negligently failed to know that it:

    a.      reported inventory and net income ($1,162.5 million and $108.5 million, respectively) which was materially overstated due to the Company's failure to follow its own stated inventory valuation procedures and establish an appropriate inventory valuation reserve.

    b.      led Plan Participants to believe that RadioShack's fully integrated management information system (which enabled the Company's home office management to track sales and/or inventory at the product level) was being used to fairly value inventory, when this was untrue.

74.      Defendants Edmondson and Barnes breached their fiduciary duty by signing the above specified certifications either knowing or negligently failing to know that the September 30, 2005 Form 10-Q:

a.      contained untrue statements of a material fact (*i.e.*, that inventory and net income were properly stated).

b.      omitted to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report (*i.e.*, that and appropriate inventory valuation reserve had not been established to properly reflect the magnitude of the Company's excess, obsolete, and slow moving inventory).

c.      contained financial statements, and other financial information that, for the reasons specified above, did not fairly present in all material respects the financial condition and results of operations of the Company as of, and for, the quarterly period ended June 30, 2005.

75.      On November 4, 2005, the Company also held a conference call.  During this call, Defendant Barnes issued the following statements:

> Secondly, *we initiated our most aggressive clearance sale of the last 10 years starting in early September in order to accelerate the sell-through of older and less strategic inventory.* The sale reduced our inventory of targeted products and resulted in a *write-down of $14 million on clearance items at quarter-end.*
>
> *          *          *
>
> . . . gross margin declined due to a very aggressive effort to improve the quality of our inventory through markdowns. We kicked off a clearance sale in September and saw significantly higher sell-through on targeted inventory. The impact of the clearance sale drove the majority of our decline in gross margins. Although dilutive to the income statement, the markdown event was necessary to reduce inventory and clear up floor space going into the fourth quarter.

(Emphasis added).

76.     In addition, during the November 4, 2005 conference call, Defendants Edmondson,

Barnes, and Babrowski responded to questions regarding the salability of the Company's inventory

and the need for markdowns as follows:

> **MARK ROWEN, ANALYST, PRUDENTIAL**: Last quarter you had a little bit higher inventory than you were anticipating. But you said that you didn't really see a need for a big inventory markdown at that time. Obviously something changed. So was there something in the environment, or what changed your thinking on that?

> **DAVE EDMONDSON**: Why don't you let me -- I want to have Claire have a little air time here. Why don't you let Claire answer that?

> **MARK ROWEN**: Okay.

> **CLAIRE BABROWSKI, EVP & COO, RadioShack**: I think as we sort of taking a look at getting ready for the golden quarter and the holiday selling season and as Dave identified we had some work going on in our mall stores. We decided that it was time to clear some space in the stores so that we could properly merchandise the items that we thought would be hot selling as we went into the holiday selling season.  So we identified a number of items that we thought, first of all, are kind of big *like toys from last year* and things like that that take up quite a bit of space.

> And then secondly, we are selling through at the rates that we had hoped for and thought we would try to do what we could to move them out so that we could turn inventory into cash and clear space in the stores for the products we want to sell in the upcoming season.

> **MARK ROWEN**: And are you basically done with that clearance now?

> **CLAIRE BABROWSKI**: No, the clearance sale continues up through the end of this month and is reflected in the reserve that David mentioned in his remarks.

> **SCOTT   CICCARELLI,   ANALYST,   RBC   CAPITAL MARKETS**: Two quick questions. First of all, can you clarify -- I think, David, you had mentioned a write-down of $14 million. Now

is that how you guys calculate the clearance, or is there an actual charge in the cost of goods?

**DAVID BARNES**: Scott, what we will do is a lower of cost to market calculation, and when we have lowered the prices, we anticipate that the clearance price levels will be permanent even after the sale ends.  So we have written down all of these products consistent with our normal calculation methodology at the end of the quarter, representing the fact that the prices are lower on many -- lower than cost on many of these products.  And so that number I mentioned was a quarter-end markdown on products that remained in our inventory.

**SCOTT CICCARELLI**: Okay, and that is -- kind of across the board, is that like handset inventory, or is it kind of last year's toys type stuff?

**DAVID BARNES**: It is actually not disproportionately wireless.  In fact, wireless made up a relatively very small portion of our clearance sale. ***It encompasses a wide variety of our non-wireless product SKUs.***

(Emphasis added).

77.    Defendants breached their fiduciary duty by falsely stating that the inventory initiative was intended to "clear some space" and that the $14 million charge to earnings constituted "a quarter-end markdown on products that remained in our inventory" when they knew or negligently failed to know that there was a huge buildup of excess, obsolete, and slow moving inventory and that, consequently, massive charges to earnings to write down this inventory were imminent.

78.    On November 30, 2005, Company officers participated in  The Southwestern Showcase Investor Conference.  During this conference, James M. Grant (Senior Director of Investor Relations) issued the following statements:

And as those of you who follow us know, related to our assortment that during the third quarter we made some permanent price moves on some underperforming SKUs, resulting in an (inaudible) inventory write-down at the end of third quarter.  Investors ask me, well, will there be more coming? (technical difficulty) – a fourth-quarter

program that fails, I never want to guarantee that we are not going to have an inventory write-down, so it could happen.

But is there stuff that we did not take care of in the third quarter that is going to creep up and bite us in the fourth? I don't think so. And most of our problems, you know, we did account for by marking them down and accounted for in a financial sense. So I don't think that would contribute to any fourth-quarter write-down.

79.   Defendants breached his fiduciary duty by falsely reassuring that all inventory valuation issues had been addressed during the third quarter when he knew or negligently failed to know that there was a huge buildup of excess, obsolete, and slow moving inventory and that, consequently, massive charges to earnings to write down this inventory were imminent.

80.   On December 16, 2005, RadioShack issued a press release announcing that the Company was unlikely to achieve its fiscal year 2005 earnings per share forecast of $2.14 to $2.24 per diluted share.

81.   On February 17, 2006, the Company issued a shocking press release which stated, in relevant part:

RadioShack Corporation (NYSE: RSH) today announced net income of $49.5 million or $0.36 per diluted share for the quarter ended December 31, 2005 versus net income of $130.9 million or $0.81 per diluted share for the quarter ended December 31, 2004. *This represents a fourth quarter 2005 rate of decline of 62% in net income and 56% in diluted earnings per share . . . .* Fourth quarter 2005 gross margin rate was 41.1% versus 49.3% the previous year, a decline of 819 basis points. *The decline was driven primarily by the write-down of $62 million in inventory as well as a merchandise mix shift and more promotional activity versus the prior period.*

"Sales results were good in many low-margin non-wireless categories; however, we experienced lower sales in high-margin categories. In addition, wireless sales and profits were below our expectations," said David Edmondson, president and chief executive officer. *"The poor fourth quarter performance caused us to take a much deeper look at the state of our business and resulted in the launch of a turnaround plan including the significant fourth quarter inventory write-down."* [...] *The company will replace old,*

*slower-moving merchandise with new, faster-moving merchandise* within higher growth categories.

(Emphasis added).

82.     The back to back third and fourth quarter surprise inventory write-down charges, each preceded by false reassuring statements regarding the salability of the Company's inventory, caused the investment community to question the integrity of the Company's management. This had a profound effect on the price of the Company's stock. It dropped from a closing price of 20.75 per share on February 16, 2006 to a closing price of 19.08 per share (an 8.04% drop) with an inordinate volume of 10,487,600 shares traded.

83.     Elaboration followed on March 15, 2006 when the Company filed its 2005 Form 10-K which stated, "during the fourth quarter of 2005 and the first quarter of 2006, we identified a significant amount of slow-moving inventory for replacement . . . . In connection with updating our inventory, we identified a significant amount of slow-moving inventory for rationalization, which, in addition to our normal inventory process, resulted in a pre-tax charge of approximately $62 million during the fourth quarter of 2005. We will continue to review our inventory composition, and we expect that we will incur additional charges of approximately $5 million to $10 million during 2006. These charges, if incurred, would increase our cost of products sold and adversely impact our margins accordingly."

84.     On April 21, 2006, the Company held a Conference call during which Defendant Barnes admitted that the Company's massive volume of excess, obsolete, and slow moving inventory which had been written down involved thousands of different products (SKU's) by stating:

> (a)     "late last year we identified thousands of SKUs that we want out of our stores before the fourth quarter of 2006 . . . the decision to liquidate this inventory resulted in a charge in the fourth quarter of 2005 and reduced profit in the first quarter

of 2006 by $1 million.   *We anticipate more modest write-downs later this year.*"

(b)   "As part of our initiative to liquidate poor-performing inventory, we launched a clearance sale at the start of April. The event will carry through to the end of August. What we don't sell by then we'll remove from our stores . . . ."

(c)   "we're liquidating poor-performing inventory which we are really not selling in any significant quantity."

(d)   "We have identified products that we do not want to stock anymore as of this September. That portfolio of products has a mixed basket of gross margins.  It includes electronic organizers and translators, likewise products, keyboard equipment, *obsolete accessories*, certain wire, and much, much more.  Many of these SKUs were never high gross margin to begin with, though when first *purchased years ago*, some were.   The main point is that we have identified products that customers no longer demand in insufficient quantity to justify the space that those products occupy in our stores, and we're going to liquidate them to make room for another basket of products that customers do want and that they trust RadioShack to sell."

(Emphasis added).

85.   Considering the back to back third and fourth quarter surprise inventory write-down charges, each preceded by false reassuring statements regarding the salability (non-impairment) of the Company's inventory, the Company's state of the art RSTS management information system, and the magnitude of the different products (SKU's) that were either "obsolete" or "not selling in any significant quantity", there is a strong inference that Defendants either knew or recklessly failed to know that the Company's inventory was materially impaired at the beginning of the Class Period. This inference is supported by the fact that "the culture of integrity" which Defendant Barnes proclaimed to exist at RadioShack did not exist, as evidenced by the fact that Defendant Edmondson was forced to resign (effective February 20, 2006) after it was disclosed that he had lied about his

professional credentials. As reported in a February 17, 2006 article in the *TheStreet.com*, only days

before the resignation:

> The struggling electronics retailer hired some lawyers this week to investigate errors on CEO David Edmondson's resume. Edmondson (pictured at right) claimed two bachelor's degrees from a small Baptist college, but the college told The Fort Worth Star-Telegram that he hadn't graduated at all.
>
> Edmondson even told the newspaper last week that one degree certificate was lost in a garage fire, though he has since backed away from those claims. "The contents of my resume and the company's Web site were clearly incorrect," Edmondson said this week in a company-issued statement, The Associated Press reported. "I clearly misstated my academic record, and the responsibility for these misstatements is mine alone."

## DEFENDANTS ARE LIABLE FOR ALL IMPRUDENT INVESTMENTS

86.     Defendants are liable for imprudent investments made by the Plan, even though the

Participants directed their individual contributions to the Plan, because the Plan and the Defendants

did not shift liability for imprudent investments by the Plan to Participants under ERISA § 404(c),

29 U.S.C. § 1104(c). Thus, Defendants' liability for losses is the same as the liability of a pension

fund manager in a traditionally defined benefit "pension" plan.

87.     Although fiduciaries can shift liability for imprudent investments from themselves

to Participants under § 404(c), Defendants failed to shift liability to Participants for imprudent

investment decisions because they failed to comply with Section § 404(c) for various reasons,

including: (i) they failed to adequately declare that the Plan was a 404(c) plan; (ii) Defendants

negligently failed to disclose to Participants all material information necessary for Participants to

make investment decisions that they were not precluded from disclosing under applicable law; and

(iii) Defendants failed to provide an adequate description of the investment objectives and risk and

return characteristics of the Plan.

88.     Because Defendants did not comply with § 404(c), Defendants are liable for losses suffered as a result of the Plan's imprudent investments, regardless of whether Participants selected the investments made by the Plan for Participants' individual accounts.

89.     Further, the act of designating investment alternatives is a fiduciary function regardless of a Plan's purported status as an ERISA § 404(c) status. The responsible Plan fiduciaries are subject to ERISA's general fiduciary standards in initially choosing and/or continuing to designate investment alternatives offered by the Plan.

90.     As RadioShack stock lost a significant amount of its value, the Plan suffered devastating losses.  Hundreds or thousands of Participants lost a substantial portion of their retirement savings.  Defendants are liable for those losses which were caused by their breaches of fiduciary duty.

**COUNT I**

**Defendants Breached Their Fiduciary Duties By
Designating RadioShack Stock As An Investment Option
And Permitting The Plan To Invest In RadioShack Stock**

91.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if they were fully set forth in this Count.

92.     Defendants breached their fiduciary duties by allowing the Plan to purchase and hold RadioShack shares during the Class Period and by allowing the RadioShack shares to remain as investment options under the Plan, because RadioShack stock was an imprudent investment for the Plan and the purpose of the Plan was to provide for employee retirement income security.

93.     As a result, Defendants should have terminated RadioShack stock as an investment option, halted the purchase of RadioShack shares and sold all their shares in RadioShack stock.

94.     To the contrary, Defendants failed to act in the best interest of the Plan and the Class members.

95.     To the extent that Defendants possessed material adverse nonpublic information, they should have prevented the Plan from purchasing additional RadioShack shares. They also should have directed the Plan to sell all of its RadioShack shares and disclosed this nonpublic information prior to any sales by the Plan. Had they done so, the Plan would have limited its losses substantially, even though the price might have dropped somewhat upon disclosure.

96.     Defendants were fiduciaries who breached their fiduciary duties in that they should have known the facts as alleged above and should have know that the Plan should not have invested such large amounts in RadioShack stock.

97.     Defendants are liable to personally make good to the Plan any losses to the Plan resulting from each breach under ERISA § 502(a)(2).

98.     Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should award equitable relief to the Class.

## COUNT II

### Failure To Prudently And Loyally Manage the Assets Of The Plan – Breaches Of Fiduciary Duties In Violation Of ERISA § 404 - All Defendants

99.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if they were fully set forth in this Count.

100.    At all relevant times, as alleged above, the Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

101.    Defendants were responsible for selecting, maintaining and monitoring the Plan's investment options, including the option to purchase and to hold RadioShack securities.

102.   Defendants exercised discretionary authority and/or control over managing the Plan or disposing of the Plan's assets and were, during the Class Period, responsible for ensuring that investment options made available to participants in the Plan were prudent.  Defendants were responsible for ensuring that all investments in RadioShack securities in the Plan were prudent and, as a result, Defendants are liable for losses incurred as a result of such investments being imprudent.

103.   In direct violation of their duty of loyalty to the Plan and its members, Defendants failed to diverge from the Plan documents and/or directives that they reasonably should have known would lead to an imprudent result or would otherwise harm Plaintiff and members of the Class. Defendants, either themselves or through persons they direct or control, improperly followed Plan documents and directives, leading to an imprudent result that harmed the Plan's Participants.

104.   Defendants breached their duties to prudently and loyally manage the assets of the Plan.  During the Class Period, upon the exercise of reasonable care, Defendants should reasonably have known that investment in RadioShack securities was imprudent in that any such investment was unsuitable and inappropriate for either Participants or Company contributions to the Plan.  During the Class Period, Defendants, in violation of their fiduciary duties, continued to offer and require RadioShack securities as an investment requirement for the Plan and to direct and approve Plan investment in RadioShack securities, instead of other investments.  Despite the imprudence of any investment in RadioShack securities during the Class Period, Defendants failed to take adequate steps to prevent the Plan, and indirectly the Plan's Participants, from suffering losses as a result of the Plan's investment in RadioShack securities.

105.   Defendants also breached their duty of loyalty by failing to administer the Plan with single-minded devotion to the interests of Plaintiff and members of the Class, regardless of Defendants' own interests.

106.   Defendants also breached their fiduciary duties by failing to disclose that they had failed to prudently and loyally manage the assets of the Plan in the exercise of their discretion with respect to the RadioShack securities.

107.   As a direct and proximate result of Defendants' breaches of their fiduciary duties to Plaintiff and the Class, the Plan, and indirectly Plaintiff and the members of the Class, suffered for which Defendants are liable.

### COUNT III

### Failure To Monitor The Plan And Provide Accurate Information - Breaches Of Fiduciary Duties In Violation Of ERISA § 404

108.   Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if they were fully set forth in this Count.

109.   During the Class Period, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

110.   The duty of the fiduciary includes at least:

(a)   a duty not to misinform;

(b)   a duty to inform when the fiduciary knows or should know that silence might be harmful; and

(c)   a duty to convey complete and accurate information material to participants and beneficiaries.

111.   Defendants negligently misrepresented to Participants the riskiness of their investments in RadioShack stock by failing to provide an adequate description of the investment objectives and risk and return characteristics of RadioShack stock. Defendants failed to disclose that

the performance and value of RadioShack stock in Participants' accounts were substantially affected by the facts and risks alleged above.

112.    Defendants breached their fiduciary duties in that they negligently made material misrepresentations and negligently failed to disclose material information to Participants concerning the Plan's investment options as alleged above.

113.    In breach of their fiduciary duties, Defendants also made negligent misrepresentations and negligently failed to disclose material information to Participants.

114.    Defendants should have known that their negligent misstatements and nondisclosures alleged above would artificially inflate the market price of RadioShack securities, and that the price the Plan paid for RadioShack shares would likewise be inflated.  As a result of these negligent misrepresentations and nondisclosures, the Plan's purchases of RadioShack stock were imprudent because the shares cost more than their true value.

115.    Moreover, Defendants should have known that when the market learned the truth about RadioShack's problems, the market price of RadioShack securities - and the value of the Plan - would drop which would further cause the investments in RadioShack stock to be imprudent.

116.    The Plan and the Participants relied upon, and are presumed to have relied upon, Defendants' representations and nondisclosures to their detriment.

117.    As a consequence of Defendants' misrepresentations and nondisclosures, the Plan suffered losses.

118.    Defendants are personally liable to make good to the Plan any losses to the Plan resulting from each breach.

119.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should award equitable relief.

## COUNT IV

### Failure To Monitor The Plan And Provide The
### Administrators Of The Plan And Other Fiduciaries
### With Accurate Information - Breaches Of
### Fiduciary Duties In Violation Of ERISA § 404

120.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if they were fully set forth in this Count.

121.    During the Class Period, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

122.    By virtue of their fiduciary responsibilities, Defendants also were bound to monitor other fiduciaries and to provide them with information sufficient to perform their duties overseeing the Plan and its investments.

123.    Defendants breached their duties to monitor and inform by:

(a)     Failing to ensure that the monitored fiduciaries had access to knowledge about RadioShack's risk associated with its financials, as alleged above, which made the RadioShack securities an imprudent investment;

(b)     Failing to ensure that the monitored fiduciaries appreciated the increased risk posed by the significant investment by rank and file employees in the RadioShack securities; and

(c)     Failing to disclose to the monitored fiduciaries accurate information about the operations of and risks to RadioShack that Defendants reasonably should have known the monitored fiduciaries needed to have in order to make sufficiently informed decisions about what investment options the Plan should offer.

124.    Defendants are liable as co-fiduciaries because:

(a)    They participated in the fiduciary breaches by their fellow Defendant-fiduciaries in the activities described in this Complaint;

(b)    They enabled the breaches by these Defendants; and

(c)    They reasonably should have known of these breaches yet made not effort to remedy them.

125.    As a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiff and the members of the Class, suffered for which Defendants are liable.

## COUNT V

### Failure To Provide Complete And Accurate Information To The Plan's Participants – Breaches Of Fiduciary Duties In Violation Of ERISA §§ 404 And 405

126.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if they were fully set forth in this Count.

127.    During the Class Period, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. §1002(21)(A).

128.    During the Class Period, Defendants' fiduciary duties bound them to ensure that communications by and about the Plan and its assets were truthful, complete and not misleading, including information concerning the investment options the Plan offered.

129.    Throughout the Class Period, Defendants failed to provide Participants in the Plan with complete and accurate information regarding RadioShack's operations and risks. This information was necessary for Participants in the Plan to accurately assess the quality of an investment in RadioShack securities. Defendants conveyed false and misleading material information to Plaintiff and the Class, regarding the soundness of RadioShack securities and the prudence of investing retirement savings in RadioShack securities.

130.    Defendants' fundamentally deceptive affirmative misrepresentations and omissions were material to Plaintiff's and the other Class members' determinations about investing in or maintaining their investments in RadioShack securities. As such, Plaintiff and members of the Class are presumed to have relied to their detriment on Defendants' misleading statements, acts and omissions.

131.    As a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiff and the members of the Class, suffered for which Defendants are liable.

### COUNT VI

**Failure To Act Exclusively In The Interests Of
Participants In The Plan – Breaches Of
Fiduciary Duties In Violation Of ERISA §§ 404 And 405**

132.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if they were fully set forth in this Count.

133.    During the Class Period, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

134.    Defendants were duty bound to act with undivided loyalties to the Plan, binding them to discharge their responsibilities solely in the interest of Plaintiff and the members of the Class and for the exclusive purpose of providing benefits to the Plan, Plaintiff and the Class.

135.    Defendants breached their duty of loyalty by:

(a)    Failing to engage independent fiduciaries who could make independent judgments concerning the Plan's investments in RadioShack securities;

(b)    Failing to notify appropriate federal agencies of the facts and transactions which made RadioShack securities an unsuitable investment for the Plan;

(c)     Failing to take such other steps as were necessary to ensure that the interests of Plaintiff and members of the Class were loyally and prudently served;

(d)     By otherwise placing the interests of RadioShack and themselves above the interests of the Participants with respect to the investments of the Plan in RadioShack securities; and

(e)     As a direct and proximate result of the breaches of fiduciary duty alleged herein, the Plan, and indirectly Plaintiff and the members of the Class, suffered for which Defendants are liable.

## COUNT VII

### Defendants, Other Than The Trustee, Are Liable
### As Co-Fiduciaries For The Breaches Of Fiduciary Duties

136.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if they were fully set forth in this Count.

137.    Any allegation in this count that any Defendant had actual knowledge is limited to this Claim and is not intended to alter or amend any allegation contained in any other part of this Complaint.

138.    Each Defendant (other than the Trustee) is liable for the acts of the other Defendants as a co-fiduciary.  Upon information and belief, each Defendant (other than the Trustee) (a) knowingly participated in, or knowingly undertook to conceal, the breaches of the other fiduciaries; (b) by virtue of his or her own breach of fiduciary duty, enabled the other Defendants to breach their fiduciary duties; and/or (c) had knowledge of other Defendants' breaches and failed to take reasonable steps to remedy them.

139.    Upon information and belief, Defendants knew that RadioShack's negligent misstatements and nondisclosures would artificially inflate the market price of RadioShack securities and that the price the Plan paid for RadioShack shares would likewise be inflated.  Upon information

and belief, Defendants knew that as a result of these negligent misrepresentations and nondisclosures, the Plan's purchases of RadioShack stock were imprudent because the shares cost more than their true value. Moreover, upon information and belief, Defendants knew that when the market learned this undisclosed information, the market price of RadioShack securities - and the value of the Plan - would drop, which further caused investment in RadioShack stock to be imprudent.

140.    Defendants are liable as co-fiduciaries for the other Defendants' breaches of fiduciary duties because the Defendants: (i) knowingly participated in, or knowingly undertook to conceal, the breaches of the other fiduciaries; (ii) by virtue of their own breaches of fiduciary duties, enabled the other Defendants to breach their fiduciary duties; and/or (iii) had knowledge of the other Defendants' breaches and failed to take reasonable steps to remedy them as follows:

(a)    RadioShack enabled the other Defendants to breach their duties of truthful disclosure by failing to exercise its power and fulfill its duties as a Plan fiduciary to take reasonable actions to prevent the other Defendants from breaching their specific duties. As a co-fiduciary and an Administrator of the Plan, RadioShack failed to make proper inquiries regarding the Plan's disclosures, management and investment in RadioShack stock and remained inactive while other fiduciaries breached their duties of truthful disclosure; and

(b)    RadioShack, as a corporate entity, possessed constructive knowledge of the other Defendant's fiduciary breaches because the knowledge and actions of other Defendants - as corporate agents, officers, directors and employees of RadioShack - are attributable to RadioShack. Although RadioShack had constructive knowledge of the fiduciary breaches set forth in this Complaint, it failed to take reasonable steps to remedy those breaches.

141.    As a consequence of the Defendants' breaches, the Plan suffered losses.

142.    The Defendants are liable to personally make good to the Plan any losses to the Plan resulting from each breach under 29 U.S.C. § 502(a)(2).

## COUNT VIII

### Prohibited Transactions
### In Violation Of ERISA § 406

143.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if they were fully set forth in this Count.

144.    In connection with their actions and omissions in authorizing and causing the Plan to continue to offer and require RadioShack securities as an investment during the Class Period and permitting and requiring Plaintiff and members of the Class to invest in RadioShack securities at a time when Defendants reasonably should have known about the significant risk to RadioShack - material facts that were undisclosed or misrepresented to Plaintiff and the Class - and that as a result, the prices per share at which the Plan was acquiring RadioShack securities grossly exceeded fair market value, Defendants caused the Plan to engage in transactions that constituted direct or indirect sales or exchanges of property between the Plan and the party-in-interest, in violation of ERISA § 406(a), 29 U.S.C. § 1106(a).

145.    Because the price Defendants caused the Plan to pay for such securities was materially, artificially inflated, exceeding fair market value, the prohibited transactions are not exempt under the provisions of ERISA § 408(e)(1), 29 U.S.C. § 1108(e)(1).

146.    RadioShack is liable for this violation as a "party in interest" as defined in ERISA § 3(14)(c) for participating in the prohibited transactions.

147.    During the Class Period, RadioShack securities were artificially inflated in value such that Defendants continued to engage in prohibited transactions by causing the Plan to pay an artificially inflated price for RadioShack securities.

148.    During the Class Period, the Plan invested, upon information and belief, millions of dollars in RadioShack securities, at artificially inflated prices. The Plan and its Participants thus over-paid for their "participation interests" in the Plan.

149.    Because the Plan's acquisition of RadioShack securities at artificially inflated prices were prohibited transactions, a *per se* violation of ERISA § 406(a), 29 U.S.C. § 1106(a), under ERISA §§ 409(a) and 502(a)(2)-(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2)-(3), Plaintiff seeks on behalf of herself and the members of the Class to rescind all transactions purchasing or acquiring RadioShack securities.

150.    Further, to restore the Plan and its Participants to the positions they would have been in had Defendants not engaged in the prohibited transactions, the Plan is entitled to recover the amount that the contributions used to purchase RadioShack securities for the Plan would have earned had such amounts been invested in suitable investment options.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

151.    Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above.

152.    As a consequence of the Defendants' breaches, the Plan suffered significant losses.

153.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary who breaches any of the duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . . ."

154.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the Participants in the Plan would not

have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the values of the Plan's assets to what they would have been if the Plan had been properly administered.

155.    Plaintiff and the Class are therefore entitled to relief from Defendants in the form of: (i) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (ii) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2-3), 29 U.S.C. §§ 1109(a) and 1132(a)(2-3); (iii) reasonable attorney fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (iv) taxable costs and (v) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

156.    Each Defendant is jointly liable for the acts of the other Defendants as a co-fiduciary.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for:

A.    A Determination that the instant action may be maintained as a class action under Rule 23, Federal Rules of Civil Procedure, appointing Plaintiff as class representative, and determining that Plaintiff's counsel satisfies the prerequisites of Rule 23(g);

B.    A Declaration that Defendants breached ERISA fiduciary duties owed to the Plan and the Participants;

C.    A Declaration that Defendants are not entitled to the protection of ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

D.    An Order compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the Participants would have made if Defendants had fulfilled their fiduciary obligations;

E.    Imposition a Constructive Trust on any amounts by which Defendants were unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

F.    An Order enjoining Defendants from any further violations of their ERISA fiduciary obligations;

G.    Actual loss of benefits in the amount of any losses the Plan suffered, to be allocated among the Participants' individual accounts in proportion to the accounts' losses;

H.    An Order that Defendants allocate the Plan's recoveries to the accounts of all Participants who had any portion of their account balances invested in RadioShack common stock maintained by the Plan in proportion to the accounts' losses attributable to the decline in the price of RadioShack common stock;

I.    An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

J.    An order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

K.    An Order for equitable restitution and other appropriate equitable monetary relief against Defendants.

Dated: December 28, 2006.

**HOEFFNER & BILEK, L.L.P.**

Thomas E. Bilek
State Bar No. 02313525
1000 Louisiana, Suite 1302
Houston, Texas  77002
(713) 227-7720
FAX (713) 227-9404

**GAINEY & McKENNA**
Thomas J. McKenna
295 Madison Avenue, 4th Floor
New York, NY  10017
Tel: (212) 983-1300

**ATTORNEYS FOR PLAINTIFF**

ORIGINAL

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

RECEIVED
U.S. DISTRICT COURT
NORTHERN DISTRICT

## I. (a) PLAINTIFFS

Robert Outlaw, on behalf of himself and all others similarly situated

### DEFENDANTS

RadioShack Corporation, et al.

2006 DEC 29 AM 9: 46

CLERK OF COURT

(b) County of Residence of First Listed Plaintiff    Orange, CA
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
Thomas E. Bilek, Hoeffner & Bilek, LLP, (713) 227-7720
1000 Louisiana, Suite 1302, Houston, TX  77002

Attorneys (If Known)

4-06CV-900-A

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government
        Plaintiff

☒ 3  Federal Question
        (U.S. Government Not a Party)

☐ 2  U.S. Government
        Defendant

☐ 4  Diversity
        (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers' Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury - Med. Malpractice<br>☐ 365 Personal Injury - Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck<br>☐ 650 Airline Regs.<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other | ☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br>**SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)) | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Sat TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 890 Other Statutory Actions<br>☐ 891 Agricultural Acts |
| **REAL PROPERTY**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **CIVIL RIGHTS**<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 444 Welfare<br>☐ 445 Amer. w/Disabilities - Employment<br>☐ 446 Amer. w/Disabilities - Other<br>☐ 440 Other Civil Rights | **PRISONER PETITIONS**<br>☐ 510 Motions to Vacate Sentence<br>**Habeas Corpus:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | **LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt.Reporting & Disclosure Act<br>☐ 740 Railway Labor Act<br>☒ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS—Third Party 26 USC 7609 | ☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information Act<br>☐ 900 Appeal of Fee Determination Under Equal Access to Justice<br>☐ 950 Constitutionality of State Statutes |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):

Brief description of cause: 29 USC 1132 -- Violations of 29 USC 1104, 1109

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):   JUDGE   Terry Means   DOCKET NUMBER   4-06-CV-0499-Y

DATE
Dec. 28, 2006

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT #  FWDSMB      AMOUNT  350      APPLYING IFP      JUDGE  A      MAG. JUDGE